STATE OF CONNECTICUT *v.* ANTHONY J. BROCUGLIO
(AC 18520)

Pellegrino, Dranginis and Hennessy, Js.

Argued December 7, 2000—officially released July 3, 2001

*Jon L. Schoenhorn*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom were *Adam B. Scott*, assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Anthony J. Brocuglio, appeals from the judgment of conviction, rendered after a jury trial, of two counts of interfering with an officer

in violation of General Statutes § 53a-167a (a).[1] On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress certain evidence obtained as a result of a warrantless search and seizure, (2) violated his right to confront and to cross-examine a witness by restricting impeachment of the witness, (3) restricted the admission of evidence concerning the propensity of a police officer and his dog for violence, thereby undermining the defendant's right to present a defense, (4) failed to instruct the jury that it must unanimously agree on the factual basis for the offense before voting to convict the defendant, (5) refused to instruct the jury (a) on the right to resist an illegal entry into the curtilage of one's home and (b) that the officers' warrantless entry was unlawful, and (6) imposed vague and overbroad conditions of probation that were unrelated to the offense for which he was convicted and failed to apprise the defendant of the conduct he must avoid. We reverse the judgment of the trial court and order a new trial because we agree with the defendant's first claim, which is that the court improperly denied his motion to suppress evidence obtained from a warrantless search and seizure.[2]

The jury reasonably could have found the following relevant facts. On September 27, 1996, two officers of the East Hartford police department went to the defendant's house at 59 Church Street, at the request of the East Hartford mayor's office, to ticket abandoned and unregistered vehicles.[3] While they were issuing cita-

[1] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties."

[2] We conclude that the defendant's first claim is dispositive in this matter. The remaining claims are not likely to arise in a new trial. We therefore need not address claims two through six.

[3] On July 11, 1995, in the Superior Court for the judicial district of Hartford, the town of East Hartford moved to enjoin Ruth Healt, the defendant's wife and the owner of 59 Church Street, from violating the town's zoning ordinances by keeping certain vehicles on her property. On September 26, 1996, as a result of pretrial discussions, the town reached an oral agreement

tions, the officers went to areas contiguous to the defendant's residence. The areas consisted of the rear yard, which was protected by a fence, and an unprotected area near the front of the defendant's residence. The ticketing was done pursuant to East Hartford's Code of Ordinances, § 21-1 et seq.[4] The officers had no search warrant, either administrative or otherwise.

The officers first began to ticket vehicles located in the driveway of the defendant's front yard. While the police were in the front of the house, the defendant's wife came outside and ordered the officers off her property. The officers responded that they had been sent by the town and were acting pursuant to one of its ordinances. The defendant's wife went back inside to call the officers' watch commander, and the defendant came outside. The defendant also ordered the officers off the property. The officers repeated that they were sent by the town and instructed the defendant to call the watch commander.

In response to the officers' comments, the defendant cursed about the mayor and threatened to bring his dog outside if the officers did not leave. The defendant also

---

with Healt on the zoning matter, and on the presence of registered and unregistered vehicles on her property that were owned by the defendant. The agreement required that six vehicles on Healt's property be brought into compliance with zoning ordinances within fourteen days and that two vehicles be removed or registered within thirty days or be subject to impoundment by the town. The attorney for the town discovered, after the pretrial agreement was made, that a town ordinance required that abandoned or unregistered vehicles be ticketed thirty days before impoundment by the town. Thus, the attorney realized that the town could not enforce its agreement with Healt unless it was able to ticket the vehicles that may be subject to impoundment. To effectuate the task of getting the vehicles ticketed, the attorney enlisted the help of the mayor of East Hartford.

[4] Section 21-1 (b), titled, "Abandoned Vehicles Prohibited," provides in relevant part: "No person shall park, store, leave or permit the parking, storing or leaving of any motor vehicle of any kind which is in an abandoned condition whether attended to or not, upon any public or private property within the town. . . ."

claimed that his dog would eat one of the police dogs present at the scene. One officer responded that he would shoot the defendant's dog if he let it come outside. The defendant went inside and returned to the front of the house holding his dog by the collar. One of the officers drew his gun, upon seeing the dog, and ordered the defendant to keep his dog away. The defendant and his dog went back inside the house.

The officers finished ticketing the vehicles in the front of the house and proceeded to the backyard of 59 Church Street to continue ticketing. To get to the backyard and driveway of the house, the officers had to bypass a six foot tall stockade fence that displayed "no trespassing" and "keep out" signs. That fence ran on both sides of the defendant's house. It blocked the back driveway and yard from sight from the street in front of the house. The officers entered through the portion of the fence that extended from the side of the house across the driveway to another home.

The officers then began ticketing vehicles in the backyard. The defendant and his dog again came outside, this time onto the back porch near where the officers were ticketing. He again threatened to release his dog if the officers did not leave. At that point, according to one of the officers, the defendant took his dog down the back steps and moved toward the two officers, as he yelled profanities and threatened to let his dog go.[5] In response, one officer informed the defendant that he was under arrest. An altercation then ensued between the officers and the defendant. After the alter-

---

[5] It is unclear from the record whether the defendant in fact made threatening advances toward the officers. The other officer at the scene testified that the defendant remained on the porch. The defendant testified that he remained in the doorway with one foot inside his house and the other on the rear porch landing as he made those comments to the officers. The defendant testified that he was struck from behind by one of the officers when he turned to go back inside.

cation, the defendant was arrested, driven to the police station and then taken by ambulance to a hospital.

The defendant was charged in a substitute information with two counts of assault of a peace officer in violation of General Statutes § 53a-167c (a) (1) and three counts of interfering with an officer.[6] He was convicted of two counts of interfering with an officer. The jury acquitted the defendant of one count of interfering with an officer and one count of assault of a peace officer, and the court granted the defendant's motion for a judgment of acquittal, made at the conclusion of the state's case-in-chief, on the second count of assault of a peace officer. The defendant received a sentence of one year of incarceration and a penal fine of $1500 on one count of interfering with an officer, and one year of incarceration, execution suspended, and two consecutive years of probation, on another count of interfering with an officer. This appeal followed.

The defendant first claims that the court improperly denied his motion to suppress evidence derived from a warrantless entry onto his property.[7] The defendant argues that the motion to suppress the evidence should have been granted because the search conducted by the police violated the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut.[8] We agree in part.

---

[6] Toward the end of the altercation between the two officers and the defendant, another officer arrived at 59 Church Street. That officer assisted the others in "wrestling" the defendant and putting handcuffs on him.

[7] The defendant argues that the officers' warrantless entry onto the entire property was unconstitutional. We find, however, that the entry and ticketing in the front yard and driveway was constitutional. See *State* v. *Liptak*, 21 Conn. App. 248, 257, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990). The warrantless entry into the backyard and rear driveway that was located behind a six foot fence with "keep out" and "no trespassing" signs was unconstitutional.

[8] The state argues that the defendant failed to offer an independent and adequate analysis of his state constitutional claim and therefore, we should confine our review to the federal constitutional claim. We disagree and note

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . Practice Book § 4061 [now § 60-5]; *State* v. *Oquendo*, 223 Conn. 635, 645, 613 A.2d 1300 (1992); *State* v. *Kyles*, 221 Conn. 643, 660, 607 A.2d 355 (1992). [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

In its memorandum of decision on the motion to suppress, the court found that "[a]ny evidence that the state may seek to introduce was yielded voluntarily by the defendant. Any utterances were clearly of the accused's free will. . . . The accused was not in custody when he made his voluntary utterances. The evidence of utterances that the state may seek to introduce are not the product of an illegal search or seizure. . . . The dispositive issue is whether, even if the search was illegal, the evidence sought to be suppressed was gathered by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Citations omitted; internal quotation marks omitted.) The court found that the defendant's "independent and intervening actions broke the chain of causation and dissipated the taint of any alleged prior illegality."

"Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable. . . . The state bears the burden of proving that an exception

that on pages thirteen and fourteen of the defendant's principal brief, he offers both an independent and adequate analysis of his state constitutional claim.

to the warrant requirement applies when a warrantless search has been conducted." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 291, 764 A.2d 1251 (2001). "Under both the federal and the state constitutions, the police must first obtain a warrant before conducting a search, unless an exception to the warrant requirement applies." *State* v. *Longo*, 243 Conn. 732, 737, 708 A.2d 1354 (1998); see *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (warrant required before every search or seizure "subject only to a few specifically established and well-delineated exceptions"); *State* v. *Badgett*, 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

"Well known federal and state constitutional principles govern the exclusion of evidence derived from a warrantless entry into a home. . . . Entry by the government into a person's home . . . is the chief evil against which the wording of the Fourth Amendment is directed. . . . [W]arrantless searches and seizures inside a home . . . are presumptively unreasonable . . . and the state bears the burden of showing that an exception to the warrant requirement exists. . . . To discourage unreasonable searches and seizures, the evidence obtained as a direct result of that illegal search or seizure, as well as the fruits, or evidence derived therefrom, are excluded from evidence, unless the connection between the fruits and the illegal search has been sufficiently attenuated to be purged of its primary taint." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 681–82, 610 A.2d 1225 (1992).

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . All evidence is not, however, a fruit of the poisonous tree simply because it would not have been discovered but for the illegal action of law enforce-

ment officials. . . . Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, supra, 241 Conn. 656–57. "[T]he [exclusionary] rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . . Application of the rule is thus appropriate in circumstances in which this purpose is likely to be furthered." (Internal quotation marks omitted.) *Payne* v. *Robinson*, 207 Conn. 565, 570, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988).

Article first, § 7, of the constitution of Connecticut affords even greater protection to Connecticut citizens than does the fourth amendment to the United States constitution. *State* v. *Geisler*, supra, 222 Conn. 684. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . We have also, however, determined in some instances that the protections afforded to the citizens of this state by our constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Citations omitted; internal quotation marks omitted.) Id. "[T]he exclusionary rule under article first, § 7 requires that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances." Id., 690.

As a preliminary matter, we must first consider whether the defendant has a reasonable expectation of privacy in his rear yard and driveway such that a warrant is required. We conclude that the defendant's fenced backyard and driveway of his single-family, private home constitutes constitutionally protected curtilage[9] of the house. The defendant therefore had an expectation of privacy in the fenced area equal to that of the house itself. "The question of whether a warrantless search of an area adjacent to a house is constitutionally forbidden turns on whether the search constitutes an intrusion upon what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public. . . . If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so." (Citation omitted; internal quotation marks omitted.) *State* v. *Liptak*, 21 Conn. App. 248, 255, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990).

The United States Supreme Court has determined that the curtilage question "should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United*

---

[9] "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." (Citation omitted.) *Oliver* v. *United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984).

*States* v. *Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987); *State* v. *Liptak,* supra, 21 Conn. App. 256.

Our review of the facts and record in the present case establishes that the four factors identified in *Dunn* are satisfied. The area at issue is curtilage for the following reasons: (1) it is immediately adjacent to and closely behind the house; (2) the back driveway and yard are gated by a six foot tall, opaque stockade fence displaying numerous "no trespassing" and "keep out" signs; and (3) the fence across the back driveway was shut, and nothing could be observed from the street in front of the house by people passing by except the crane of a tow truck in the backyard. We conclude therefore, that the defendant had an expectation of privacy in the area in question equivalent to that of the house itself.

The warrantless entry by the officers into the fenced backyard and driveway of the defendant's house violated article first, § 7, of the constitution of Connecticut and the fourth amendment to the United States constitution. The warrantless search of the back portion of the driveway and yard was constitutionally forbidden because the defendant manifested an objective intent that the area be preserved as private. The officers came to the defendant's house to ticket abandoned and unregistered vehicles. Although two of the vehicles ticketed were in the front section of the driveway, an area of the property with a low expectation of privacy, the rest of the vehicles the officers ticketed were behind a fenced driveway with "no trespassing" and "keep out" signs affixed. The two vehicles in the front section of the driveway, which could be seen from the street by the public and were not behind a fence, could be ticketed without a warrant because the defendant's privacy expectation in those vehicles was diminished. The

record discloses little attempt by the defendant to make the front driveway a private area.

The record, however, discloses ample evidence that the defendant manifested an objective intent to keep his back driveway and yard area private. That is evidenced by his placement of a six foot tall fence in the middle of the driveway and the numerous "no trespassing", "keep out" and "beware of the dog" signs on both the fences and the front porch facing the public street. The areas in question here were curtilage of the house and thus the privacy expectation in the areas was the same as that inside the house. To enter those areas, for the purpose of checking vehicle identification numbers and ticketing vehicles, without a warrant was a violation of the defendant's rights under both article first, § 7, of the constitution of Connecticut and the fourth amendment to the United States constitution.

By contrast, we conclude that the defendant had a lesser expectation of privacy in the area in front of the house. That area includes the open, unfenced driveway that can be seen from the street and sidewalk. The court therefore properly denied the motion to suppress the evidence with respect to the two vehicles in that area.

We now consider whether the exclusionary rule requires the evidence derived from the illegal entry into the backyard to be suppressed or whether the illegal search has been purged of its primary taint. "[T]he factors to be considered in determining whether the taint [of an illegal warrantless search] has been dissipated include the temporal proximity of the illegal police action and the discovery of the evidence, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." (Internal quotation marks omitted.) *State* v. *Blackman,* 246 Conn. 547, 557, 716 A.2d 101 (1998). "These factors focus upon the

causal relationship between the primary illegality, in this case the illegal [entry], and the evidence allegedly derived from this illegal conduct, and the actual purpose and flagrancy of the police conduct." *State* v. *Ostroski*, 201 Conn. 534, 547, 518 A.2d 915 (1986).

On appeal, the defendant argues that the condition of the vehicles in the backyard, their vehicle identification numbers, the officers' description of the backyard, and the verbal utterances the defendant directed at the officers, in the backyard, including the defendant's alleged threats, must be suppressed as the fruit of an illegal, warrantless search. The state claims however, that "assuming, without conceding, that the warrantless entry into the defendant's backyard was unlawful and that the recording of the [vehicle identification] numbers of cars there was the product either of a search or plain view tainted by the unlawful entry, none of the evidence connected with the defendant's subsequent [conviction of interfering with an officer] resulted from any police exploitation of the primary illegality. Instead, it was the product of a new, distinct crime that independently intervened to break the chain of causation and dissipate any taint." The state cites federal cases to support the claim that a new, distinct crime can intervene to break the chain of causation and to dissipate any taint of the officers' warrantless illegal entry.[10] The

---

[10] The state cites the following cases and others in support of its claim that a new, distinct crime independently intervened to break the chain of causation and dissipate any taint: *United States* v. *Sprinkle*, 106 F.3d 613, 616 (4th Cir. 1997) (illegal stop followed by unlawful pointing of gun at officer); *United States* v. *Waupekenay*, 973 F.2d 1533, 1537 (10th Cir. 1992) (illegal entry into house trailer followed by suspect aiming rifle at police); *United States* v. *Udey*, 748 F.2d 1231, 1240 (8th Cir. 1984) (invalid search warrant for house followed by someone in house shooting), cert. denied, 472 U.S. 1017, 105 S. Ct. 3477, 87 L. Ed. 2d 613 (1985); *United States* v. *King*, 724 F.2d 253, 256 (1st Cir. 1984) (illegal attempted search of passenger followed by driver's shooting at police).

We do not find those cases relevant to our decision in this case. The cases cited differ from this case because they involve heightened, armed aggression toward police officers or assaults on them that constituted new,

parties cite no controlling Connecticut authority or United States Supreme Court precedent on that issue, and our review reveals none.

If a suspect's response to an illegal search "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime. . . . There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. As the [*United States* v. *Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982), cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983)] court recognized, [a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." (Internal quotation marks omitted.) *United States* v. *Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997).

In this case, the defendant's verbal utterances to the officers requesting that they leave his property or he would let his dog loose do not constitute a new, distinct crime. We conclude that the legal conclusions of the court as contained in its memorandum of decision on the motion to suppress do not find support in the facts. The evidence sought to be suppressed in this case was obtained as a direct result of the officers, illegal, warrantless search of the defendant's fenced backyard and driveway. The evidence sought to be suppressed was acquired by exploitation of the officers' primary illegality, the warrantless search within the curtilage of the house. The evidence here was not acquired by means sufficiently distinguishable to purge the primary taint of the officers' initial illegality. No intervening factors occurred that sufficiently purged the primary taint of

distinct crimes. This case involves only verbal utterances made to the officers, requesting that they leave the defendant's property or he would let his dog loose on them.

the officers' warrantless search. Consequently, the evidence obtained from the time the officers bypassed the fence and entered the back driveway and yard until the time of the defendant's arrest should have been suppressed.

The defendant moved that the observations made by the officers from the time of their entry onto the property until the time of the his arrest be suppressed. The court declined, however, to exclude that evidence on the ground that the exclusionary rule should not be extended to suppress evidence of independent crimes occurring in response to an unlawful search or arrest. The defendant made verbal utterances to the police, who were illegally on his property, to leave his property or he would let his dog loose. The officers should have left until and unless they secured a warrant to check for vehicle identification numbers to legally ticket vehicles stored on private property in violation of a town ordinance. No exception to the warrant requirement existed here.

The chain of causation was not broken during the incident at issue. The defendant and his wife, who was the property owner, had put the officers on notice that they objected to the warrantless search. The defendant's wife followed the instructions of the officers to call the watch commander to voice her objections. That attempt was futile. The history of legal entanglements between the town and the defendant exacerbated the conflict and may have impaired a more peaceful resolution of this attempt by the town to perfect its civil agreement for the removal of the offending vehicles.

The resistance to the search in this case took the form of verbal utterances, which at least one officer took as threat. That resistance is the act that the state claims is the "independent circumstance" that would purge the taint of the police illegality. The response by

the defendant was ongoing, without intervening circumstances, pertaining to a minor violation of a town ordinance. The public safety purpose of the police intervention simply was not important enough to outweigh the constitutional protection of article first, § 7, of the constitution of Connecticut and the fourth amendment to the United States constitution.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.