DEMETRIUS P. TRAGGIS, TRUSTEE *v.* SHAWMUT
BANK CONNECTICUT, N.A., ET AL.
(AC 21676)
(AC 21962)

Foti, Spear and Hennessy, Js.[1]

---

[1] This appeal was argued before a panel comprised of Judges Foti, Spear and Hennessy. Although Judge Spear agreed with the other judges regarding the resolution of this appeal, he died before he had the opportunity to concur with the written decision. The parties stipulated, however, that they would not reargue the appeal to this court with a panel consisting of the original two judges and an additional judge. Rather, the parties stipulated that they would permit the remaining two judges alone to render a written decision.

252

Argued April 24—officially released September 10, 2002

 

*Joseph Glass*, with whom, on the brief, was *Paul Glass*, for the appellant (plaintiff).

*Roger J. Frechette*, with whom, on the brief, was *Howard C. Kaplan*, for the appellees (defendants).

*Opinion*

HENNESSY, J. The plaintiff, Demetrius P. Traggis, trustee, appeals from the judgments of the trial court reforming a contract between him and the defendant Shawmut Bank Connecticut, N.A.,[2] on the defendant's counterclaim and granting the defendant's motion for summary judgment on the plaintiff's complaint. On appeal, the plaintiff claims that there was insufficient evidence to support the court's decisions granting the reformation of the contract of sale and rendering a summary judgment in favor of the defendant. Specifically, he claims that the court improperly (1) reformed the contract on the basis of evidence of prior written contracts between him and the defendant's predecessor in interest, (2) reformed the contract without clear, substantial and convincing proof of mistake, (3) reformed the contract without properly considering his special defenses of estoppel, laches and waiver, (4) failed to consider the entire record before reforming the contract, (5) found inequitable conduct on his part as a result of having relied on legal authority that was not applicable to the facts of this case, (6) ruled on January 30, 2001, the date of trial on the defendant's counterclaim, that his answer and special defenses to

[2] Shawmut Bank Connecticut, N.A., formerly was Gateway Bank and presently is known as Fleet Bank. Timothy J. Kennelly, Jr., a real estate broker, also was named as a defendant. The action as to Kennelly was withdrawn. We therefore refer in this opinion to Shawmut Bank Connecticut, N.A., as the defendant.

the defendant's amended counterclaim actually was a motion to amend his previous answer and special defenses to the counterclaim, and (7) rendered a summary judgment in favor of the defendant.

The following facts are relevant to the resolution of the plaintiff's appeal. In April, 1993, the defendant's predecessor in interest, Gateway Bank, listed a property for sale with a Realtor, Timothy J. Kennelly, Jr. Kennelly showed the property to the plaintiff, who signed a preprinted, short form agreement to purchase the property. Gateway Bank submitted the agreement to its attorney, Marshall Goldberg, for review. Goldberg drafted a more comprehensive contract with a $575,000 purchase price. The parties executed the contract on or about August 27, 1993, with a closing date "on the later to occur of December 15, 1993, or Town of Cheshire approval of Purchaser's intended addition to the premises . . . or on such other date as may be agreed upon by the parties hereto."

The parties agreed on a number of extensions during which time the plaintiff obtained an appraisal of the subject property in the amount of $450,000. On June 23, 1994, the prior contract was discarded, and the plaintiff and his partner signed a new preprinted, short form agreement for the purchase of the property. The purchase price under the new agreement was $450,000 with a $28,750 deposit. The agreement also contained a third party financing contingency providing that if the plaintiff and his partner were unable to secure a commitment for mortgage financing in the amount of $450,000 within sixty days and they timely notified the defendant of such inability, the agreement would become null and void and the deposit would be returned to the plaintiff. The new agreement listed August 26, 1994, as the closing date.

After the short form agreement was signed, Kennelly, who had negotiated its terms with the plaintiff, submit-

ted it to the defendant. The defendant then submitted the matter to Goldberg for the drafting of a new contract. That contract, which forms the foundation of the plaintiff's complaint, was entered into by Shawmut Bank, N.A., as "successor in interest to Gateway Bank." The defendant informed Goldberg that it wanted the closing to occur in two weeks. On or about July 29, 1994, Goldberg marked a copy of the original contract and told his secretary that the closing date on the new contract was to be "the fifteenth," by which he meant August 15, 1994. The secretary, however, typed "August 15, 1995."[3] Goldberg sent the contract to Kennelly on July 29, 1994, and Kennelly gave the contract to the plaintiff to sign. Kennelly explained to the plaintiff that the reason for the defendant's acceptance of the $450,000 price was the fact that there would be a closing in two weeks. The plaintiff replied, "[o]kay." The plaintiff then reviewed the contract with his partner. After all parties signed the contract, Kennelly gave a copy to the plaintiff and said, "We're all set for next week."[4]

After the August 15, 1994 closing date passed without a closing, the plaintiff claimed that he had another year to close. During a conversation, the defendant's attor-

---

[3] The agreement contained the following relevant provisions. The contract is "made as of the ___ day of August, 1994" with the space preceding the word "day" left blank. The purchase price is $450,000, consisting of a deposit of $28,750 and $421,250 due at the time of closing. The closing was to take place "on August 15, 1995 . . . or on such other date as may be mutually agreed upon by the parties hereto." The contract also states in relevant part: "It is understood and agreed that this written Agreement . . . constitutes the entire contract between the parties hereto, and that no oral statements or promises, and no understanding not embodied in this writing, shall be valid or binding." The contract further states that it "is conditioned upon the Purchaser executing and delivering [it] together with the down-payment to the Seller's Attorneys on or before August 10, 1994 at 5:00 P.M., time being of the essence."

[4] At trial, the plaintiff and his partner denied that those conversations with Kennelly had occurred. The court found that the testimony of the plaintiff and his partner on that point was not credible.

ney told the plaintiff's attorney that the August 15, 1995 closing date typed in the contract had been a mistake. The plaintiff's attorney replied, "I know it's a mistake, but it's the only weapon I have."

On October 14, 1994, the defendant sent a letter to the plaintiff, stating that it would tender to him a deed to the property at a closing to be held on October 27, 1994,[5] or, in the event that the closing did not occur on that date, the defendant stated that it would pursue its remedies under the contract. No closing took place on October 27, 1994, and the plaintiff maintained that he was not obligated to close until August 15, 1995. The defendant sold the property to a third party on March 31, 1995. Thereafter, the plaintiff brought an action against the defendant, alleging breach of contract. In the complaint, the plaintiff alleged that the defendant had breached the contract by selling the property to a third party. The defendant filed an answer and special defense in which it claimed that the contract was executed as the result of mutual mistake or a mistake of the defendant coupled with actual or constructive fraud on the part of the plaintiff. The defendant also filed a counterclaim seeking reformation of the contract to reflect the actual closing date on which the parties allegedly had agreed, August 15, 1994, instead of the closing date of August 15, 1995, as stated in the contract. The plaintiff, in turn, filed special defenses of estoppel and laches. Specifically, the plaintiff claimed that the defendant was guilty of laches because it sold the property to a third party and should be estopped from claiming a reformation of the contract where the sale had made reformation impossible.

Thereafter, the defendant filed an amended counterclaim that was identical to the previous counterclaim except that it deleted typographical errors. The plaintiff

---

[5] The defendant unilaterally picked that date.

then filed an amended answer and special defenses to the amended counterclaim that included the following additional allegations: (1) the defendant was guilty of laches because it did not make any claim for reformation until more than four years after the contract date of August 9, 1994; (2) the defendant should be estopped from seeking reformation because the plaintiff was prejudiced when it obtained a mortgage loan on March 31, 1995, in reliance on the contract closing date of August 15, 1995; and (3) the defendant waived the alleged mistake of the closing date by not claiming a rescission of the August 9, 1994 contract, by unilaterally changing the closing date to October 27, 1994, and by retaining possession of the plaintiff's deposit check. The court treated the plaintiff's second answer and special defenses as a motion to file an answer and subsequently denied the motion. By agreement of the parties, the counterclaim was tried to the court on January 30, 2001, prior to any hearing of the allegations contained in the plaintiff's complaint. The court thereafter rendered judgment in the defendant's favor on its counterclaim for reformation of the contract. Subsequently, the defendant filed a motion for summary judgment on the complaint, which was granted. The plaintiff filed separate appeals from each judgment. This court, sua sponte, combined the appeals. We affirm the judgments of the trial court.

I

The plaintiff first claims that it was clearly erroneous for the court to have found in its memorandum of decision after trial on the defendant's counterclaim that the names of the banks were "inconsequential for purposes of this case," and to refer to Gateway Bank and the defendant throughout the memorandum simply as "the Bank." The plaintiff argues that the mortgage financing conditions in Gateway Bank's agreement with the plaintiff that were not contained in the subsequent

agreement with the defendant establishes that the court's decision to treat the names of the banks as "inconsequential" was erroneous. We note that there is an absence of any persuasive reasoning set forth by the plaintiff as to why the court's reference to Gateway Bank, the defendant and Fleet Bank, the name by which the defendant currently is known, collectively as "the bank," was in error or why that affects these appeals. The plaintiff neither argued at trial that the two bank mergers involving the defendant were an issue, nor did he raise it as an issue in his trial brief or reply brief. He raises it for the first time on appeal. "[E]xcept in exceptional circumstances, this court does not review claims that are not raised in the trial court." *Quickpower International Corp.* v. *Danbury,* 69 Conn. App. 756, 759, 796 A.2d 622 (2002). Accordingly, we decline to review the claim.

## II

The plaintiff next contends that the court improperly reformed the contract without clear, substantial and convincing proof that the defendant was mistaken as to the closing date contained in the contract and that the plaintiff had engaged in inequitable conduct. We disagree.

Initially, we set forth the standard used by the court for reformation of the contract. "A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other." (Internal quotation marks omitted.) *Lopinto* v. *Haines,* 185 Conn. 527, 531, 441 A.2d 151 (1981). In the present case, the court found that the contract was executed as the

result of mistake by the defendant coupled with inequitable conduct on the part of the plaintiff.

On appeal, "the standard of proof for reformation [is that the] evidence should be clear, substantial and convincing." (Internal quotation marks omitted.) Id., 534. That standard of proof is sustained if the evidence "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. See *Dacey* v. *Connecticut Bar Assn.*, [170 Conn. 520, 537, 368 A.2d 125 (1976)] . . . ." (Citation omitted; internal quotation marks omitted.) *Lopinto* v. *Haines*, supra, 185 Conn. 534. Hence, if we determine that the evidence relied on by the court supports a reasonable belief that the August 15, 1995 closing date stipulated in the contract was a typographical error and that the plaintiff had engaged in inequitable conduct, then we must conclude that the reformation was proper.

In its memorandum of decision, the court set out the following findings of fact as the basis for its finding that the plaintiff had knowledge of the mistake and its decision to reform the contract. The court found that Kennelly had informed the plaintiff on July 29, 1994, when he gave the contract to the plaintiff to sign, that the reason for the $450,000 price, which was lower than the original price, was the fact that there would be a closing in two weeks. The court also found that Kennelly reaffirmed the proposed closing date when he gave a copy of the signed agreement to the plaintiff on or about August 9, 1994. At that meeting, Kennelly stated to the plaintiff, "We're all set for next week."

At trial, the plaintiff testified that those conversations with Kennelly referring to a speedy closing never occurred. The court found that the plaintiff's testimony on that issue was not credible. The court did, however,

find Kennelly's testimony to be credible and that it established that the plaintiff had notice of the defendant's intention to close approximately two weeks from the signing of the last contract. Consequently, the plaintiff's insistence on the August 15, 1995 closing date constituted inequitable conduct.

It is evident from the memorandum of decision that the court found that the testimony of the plaintiff and Kennelly constituted clear, substantial and convincing evidence that supported reformation of the contract. We agree. "[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact. . . . [I]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *State* v. *Outlaw*, 70 Conn. App. 160, 169, 797 A.2d 579 (2002). Thus, we do not retry the case by determining the credibility of the testimony that was relied on by the court to support its decision.

The plaintiff also argues that the court used improper inferences to support its finding. We disagree. The plaintiff takes issue with the court's discussion of his previous experience in the restaurant business, and its finding that he "must have known that the setting of a closing date more than one year in advance, in a setting like this, would be, to say the least, an unusual event [and] should have prompted at least some brief inquiry on [his] part." "[I]t [is] the trier's exclusive province to draw reasonable inferences from the testimony." Id. Thus, it was proper for the court to make such inferences. Additionally, we note that our review of the record makes clear that the court did not use those inferences as the sole basis for its ruling. Thus, application of the *Lopinto* clear, substantial and convincing

standard of proof to the inferences was not required. Accordingly, the plaintiff's claim is without merit.[6]

## III

The plaintiff next claims that the court arrived at its decision to reform the contract without properly considering his special defenses of estoppel, laches and waiver. We will address each claim in turn.

## A

The plaintiff claims that the court did not properly consider his special defense of estoppel.[7] Although the court stated that the plaintiff had waived that special defense by not briefing it at trial, the court did in fact address it in its memorandum of decision.[8] Accordingly, the plaintiff's claim is without merit.

---

[6] The plaintiff also argues in his brief, citing *Lopinto* v. *Haines*, supra, 185 Conn. 527, that "[w]here fraud is absent, [as the court found in the present case] it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be *clear* so as to leave no room for doubt." (Emphasis in original; internal quotation marks omitted.) Id., 535.

The plaintiff contends that there is no proof that he and the defendant's representatives sat down and orally agreed on an August 15, 1994 closing date prior to the typing of the contract sought to be reformed. We agree with the *Lopinto* court, which addressed that argument and stated: "Even where there is no actual fraud, but merely such knowledge as makes it inequitable for one party to retain his advantage, the court will deal as summarily with that inequitable position of the party, as in the other case with his fraud." (Internal quotation marks omitted.) Id.

[7] In his answer and special defenses to the defendant's counterclaim, the plaintiff claimed that the defendant should be estopped from claiming a reformation of the contract because the defendant made reformation impossible when it sold the property to a third party. In his motion to amend his answer and special defenses, the plaintiff argues that the defendant should be estopped from seeking reformation because he was prejudiced when he obtained a mortgage loan on March 31, 1995, in reliance on the contract closing date of August 15, 1995.

[8] The court stated: "Even if the defense were claimed, it would be unpersuasive on the facts found here. It is eminently possible to reform the instrument in question to state an August 15, 1994 closing date, and the bank's subsequent sale of the property does not in the least stand in the way. The purpose of the reformation sought here is to prevent a party— in this case, [the plaintiff]—from acting inequitably. That purpose can be

## B

At trial, the plaintiff put forth a special defense of laches, claiming that the defendant was guilty of laches because it sold the subject property to a third party. In his motion to amend his answer and special defenses, the plaintiff included a previously unasserted claim that the defendant had prejudiced him by waiting approximately three years after it learned of the alleged mistake in the contract to put forth a claim for reformation. On appeal, the plaintiff reasserts the proposed amended special defense of laches.

Laches occurs when neglect or omission to assert a right taken in conjunction with lapse of time and other circumstances, causes prejudice to an adverse party so as to operate as a bar to relief in equity. Black's Law Dictionary (6th Ed. 1990). "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant. *Kurzatkowski* v. *Kurzatkowski*, 142 Conn. 680, 684–85, 116 A.2d 906 (1955) . . . . The mere lapse of time does not constitute laches . . . ." (Citations omitted; internal quotation marks omitted.) *Bozzi* v. *Bozzi*, 177 Conn. 232, 239, 413 A.2d 834 (1979).

The court found, and we agree, that the passage of approximately three years between the time that the defendant learned of the mistake and the filing of its claim for reformation of the contract was not such a delay as to constitute laches, especially where the plaintiff failed to show evidence of prejudice. See *Kurzatkowski* v. *Kurzatkowski*, supra, 142 Conn. 685 (lapse of twenty-five years before institution of plaintiff's action did not constitute laches in absence of prejudice).

accomplished here. In doing so, no harm will be done to the third party that has subsequently purchased the property."

The plaintiff's only claim of prejudice is that the property was sold. At trial, the court found that the defendant's sale of the property took place before there was evidence of any change in the position of the plaintiff. After August 15, 1994, the defendant, to mitigate damages, sold the property to a third party. As the court held, that fact does not prevent the contract from being reformed. Because there was no showing of prejudice, the plaintiff's special defense of laches cannot succeed. It is clear from the record that the court properly considered the special defense before reaching its decision to reform the contract. Accordingly, the plaintiff's claim fails.

C

The plaintiff next claims that the defendant waived the alleged mistake of the closing date by not claiming a rescission of the August 9, 1994 contract on the basis of the defendant's unilaterally changing the closing date to October 27, 1994. The court did not address the issue in its opinion because the "special defense" was not part of the pleadings on which the case was tried. Consequently, the defendant argues that this court should not address that aspect of the plaintiff's claim because waiver is a special defense that must be pleaded, and the plaintiff failed to plead it at trial. See *Eastern Sportswear Co.* v. *S. Augstein & Co.*, 141 Conn. 420, 425, 106 A.2d 476 (1954).

On appeal, the plaintiff ignores that procedural defect and argues that the court was required to address the issue of waiver because the unilateral change of the closing date came into evidence without objection and was again addressed in the plaintiff's argument. We disagree.

The defendant is correct that waiver, as a special defense, must be specifically pleaded. As a result of the plaintiff's failure to plead waiver as a part of its original

pleading, the court properly refused to address the issue of waiver. See *Jones* v. *Civil Service Commission*, 175 Conn. 504, 511–12, 400 A.2d 721 (1978).

"We have stated repeatedly that we ordinarily will not review an issue that has not been properly raised before the trial court. See, e.g., *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court not required to consider any claim that was not properly preserved in the trial court); *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (court declined to consider issues briefed on appeal but not raised at trial); see also Practice Book § 60-5 (court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial). *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 485, 754 A.2d 128 (2000)." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 245, 777 A.2d 633 (2001). Accordingly, we will not address the plaintiff's claim of waiver.

IV

The plaintiff next claims that the court abused its discretion by failing to consider the entire record when determining whether to reform the contract. "Reformation [is an] equitable [proceeding]. When a decision in an equitable matter lies within the trial court's discretion, an appellate court will reverse that decision only when an abuse of discretion is manifest or where an injustice appears to have been done . . . ." *Derby Savings Bank* v. *Oliwa*, 49 Conn. App. 602, 604, 714 A.2d 1278 (1998).

The plaintiff argues that the court improperly inferred that the plaintiff had knowledge of the mistake in the contract on the basis of a statement made in September or October, 1994, by his attorney, Fred Hitt. The defendant's attorney testified that Hitt had stated, "I know

it's a mistake, but it's the only weapon I have," in a conversation they had about the closing date set forth in the contract. The plaintiff argues that the court improperly considered Hitt's statement out of context and that Hitt's statement merely was a reply to the defendant's attorney's statement and not a reflection of the plaintiff's knowledge.

The plaintiff fails to establish that the court did not take into consideration the other evidence set forth at trial. In fact, the record supports the opposite conclusion. In its memorandum of decision, the court lists the other factors it considered, including Kennelly's testimony, when making its determination that reformation was proper. Further, the memorandum of decision emphasizes the fact that the court focused on the period of July and August, 1994, as the critical period for determining if the plaintiff knew that the closing date as stated in the agreement was in error.

Our review of the record convinces us that the court did consider the whole record and properly could have found and concluded as it did. Accordingly, there was no abuse of discretion.

V

The plaintiff next argues that the court relied on legal authority that was not applicable to the present case to find inequitable conduct on his part. He contends that the court improperly cited *Essex* v. *Day*, 52 Conn. 483, 1 A. 620 (1885), *Beatty* v. *Donahue*, 249 S.W.2d 33 (Ky. App. 1952), and three treatises in arriving at its decision.

Before addressing the merits of each of the plaintiff's claims, we briefly set forth the appropriate standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws

conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 576, 800 A.2d 1102 (2002). Because, in the present case, the plaintiff contests the appropriateness of case law and black letter law used by the court when making its determination, our review is plenary.

## A

The plaintiff argues that the court quoted out of context from I.C.F. Spry, Principles of Equitable Remedies (5th Ed. 1997) p. 613, as follows: "These are cases 'in which it would be unconscionable that a party to an agreement should be able to insist that another party should be bound by its precise terms and should not be entitled to rectification in accordance with his actual intention in executing it.' " That quotation, the plaintiff argues, follows the court's citation to cases that are not consistent with the facts of this case and therefore are inapplicable to the facts of the present case. We disagree.

Upon review of the record, we conclude that the court's citation to the Spry treatise was legally and logically correct. The court cited Spry to explain one of the three possible bases for reformation a contract, that is, unilateral mistake on one side with inequitable conduct on the other. The sentence in the court's memorandum of decision that immediately precedes the quotation cited by the plaintiff reads: "The fraud cases just discussed are a species of a somewhat more comprehensive group of reformation cases involving defendants who have engaged in inequitable conduct."

The court alleviated any possible confusion caused by its citation to Spry when it explained that it found no actual or constructive fraud in the present case, but

rather that it found that the plaintiff had engaged in inequitable conduct by trying to benefit from what he knew to be a typographical mistake in the contract. Accordingly, we do not conclude that the use of the quotation from Spry's treatise was improper.

B

The plaintiff next argues that the court improperly cited *Essex* v. *Day*, supra, 52 Conn. 483, as an example of a case in which there was a unilateral mistake on one side and inequitable conduct on the other side, thereby allowing for the reformation of an agreement.

In *Day*, the town of Essex issued bonds that were to be payable in ten years. Through a printer's error, the text of the bonds stated that they were payable in twenty years. The defendant, who had knowledge of the mistake, purchased the bonds. At the end of ten years, the town called the bonds. The defendant refused to surrender them and demanded that the town continue paying interest for the remaining ten years. Our Supreme Court held that the bonds could be judicially reformed, even in the absence of fraud. Where "instead of actual fraud, there is merely such knowledge, actual or imputed by law, as makes it inequitable for the purchaser to retain his [advantage, t]he court will deal as summarily with that inequitable position of the party" as it would with a case of fraud. Id., 496.

The plaintiff argues that *Day* is not applicable because, unlike in the situation in the present case, the contract in *Day* was capable of being performed after it was reformed. He argues that because performance of the contract in this case was made impossible when the subject matter of the contract was sold by the defendant to a third party, the contract improperly was reformed by the court. He cites 66 Am. Jur. 2d, Reformation of Instruments § 74 (2001), as support for his argu-

ment.[9] The court reformed the contract in the present case to prevent the plaintiff from gaining from his inequitable conduct. Thus, although the contract could not be performed, as in *Day,* the reformation was not in vain.

The court cited *Day* as support for the proposition that reformation of a contract may be judicially accomplished where fraud is not present but where inequitable conduct is present. Because *Day* does in fact support that proposition, the court's citation to it was proper.

C

The plaintiff's claim that the court improperly relied on a quotation from 3 A. Corbin, Contracts (1960) § 610, p. 696, is misplaced. In its memorandum of decision, the court discussed *Essex* v. *Day,* supra, 52 Conn. 483, and quoted Corbin, stating: "It is certain that such a bad actor will not be permitted to enforce the agreement according to its words . . . ." 3 A. Corbin, supra, § 610, p. 696. As we previously stated, our Supreme Court in *Day,* because of the defendant's knowledge of a mistake as to when the bonds were payable, upheld the trial court's reformation of that date. The Supreme Court held that it would be *"inequitable for the purchaser to retain his advantage."* (Emphasis added.) *Essex* v. *Day,* supra, 496.

In this case, the court's citation to Corbin supports the holding in *Day.* The court concluded that this was a case for reformation because of the inequitable actions of the plaintiff. *Day* and Corbin support that decision. Accordingly, the court's reliance on the Corbin treatise was proper.

---

[9] The plaintiff's reliance on 66 Am. Jur. 2d, supra, § 74, is misplaced because unlike the situation in an Illinois case that is cited therein, reformation in this case was the only way to prevent the plaintiff from benefiting from his inequitable conduct.

## D

The plaintiff also argues that the court's citation to *Beatty* v. *Donahue*, supra, 249 S.W.2d 33, even though that case agrees with the Corbin quotation, is not applicable where there is a mistake by one party coupled with inequitable conduct by the other party. The plaintiff, however, does not claim that the Corbin quotation is incorrect or inapplicable. Thus, we will not address his claim.

## E

The plaintiff claims that the court's reliance on 3 G. Palmer, The Law of Restitution (1978) § 13.9, p. 56, was improper. We disagree. It is the plaintiff's contention that it was improper for the court to state in its memorandum of decision: "Equitable relief is appropriate in such cases, and the technique of reformation serves to accomplish the appropriate result." He argues in his brief that Palmer applies only in two cases: "[1] an agreement intentionally omitted from a writing of releasees who know the releasor's intentions with respect to release of claims; and [2] mistakes in underlying assumptions with respect to personal injury claims."

Although Palmer does acknowledge that those cases are the type of cases in which reformation is appropriate, he does not limit reformation to only those two areas. The court cited Palmer as authority for the conclusion in this case that it would be inequitable for the contract not to be reformed. Section 13.9 in the Palmer treatise, the section that the court relied on in its memorandum of decision, states: "There is a heterogeneous collection of cases in which reformation is given with little or no effort made to bring the situation within the traditional boundaries of the remedy. Some cases can be brought within those boundaries, some are borderline, and some clearly produce a contract which contract doctrine does not support. A common element is

that reformation provides a needed solution to a problem for which other remedies are unsatisfactory or unavailable." Id., pp. 53–54. Palmer then discusses a line of cases in which "[t]here are numerous other situations in which the need for relief is indicated and reformation is given primarily because it provides the most satisfactory, and sometimes the only, solution." Id., p. 55.

In referencing Palmer, the court cited to that line of cases in which "reformation is given primarily because it provides the most satisfactory, and sometimes the only, solution." Id. Nothing in Palmer reflects the plaintiff's claim that there are only two instances in which reformation is to be granted. On the contrary, there are "numerous other situations" in which reformation is an appropriate remedy. Accordingly, the plaintiff's claim is without merit.

VI

The plaintiff next claims that the court, on January 30, 2001, the date of trial on the counterclaim, improperly treated his answer and special defenses to the defendant's amended counterclaim as a posttrial motion to amend his answer and special defenses dated January 19, 1999, and improperly denied that motion. We disagree.

The following additional facts are relevant to the resolution of the plaintiff's claim. On January 2, 2001, the defendant filed a motion seeking to amend its January 14, 1999 counterclaim. In its January 14, 1999 counterclaim, the defendant inadvertently numbered the last two paragraphs, which were intended to constitute the ad damnum clause. In response to the defendant's motion to amend, the plaintiff filed an answer, raising the special defenses of estoppel, laches and waiver. For the first time, the plaintiff alleged (1) that he had applied for a new mortgage loan in reliance on the 1995 closing

date, and (2) that the defendant had waived the alleged mistake by not claiming a rescission of the August 9, 1994 contract, by retaining possession of the plaintiff's deposit and by unilaterally changing the closing date to October 27, 1994. The court granted the defendant's motion to amend its counterclaim, treating the defendant's original omission of the ad damnum as a "typographical error." The court noted that the plaintiff did not object to the defendant's motion.

With respect to the plaintiff's second answer and new special defenses, the court stated: "This is really a case where the amendment to the counterclaim is a purely clerical and typographical matter. . . . But what we have here is, [the plaintiff's attorney] admits is, a really substantively new version of the special defenses. And this is filed after the trial, and the court believes that this is not in keeping with either the Practice Book or the spirit of procedural due process. So, sir, what I'm going to do is treat your answer first as a motion to file the answer, and I am going to deny that and you will—the court will treat you as proceeding on the answer filed or dated January 19, 1999." The plaintiff now takes exception to the court's treatment of his answer.

"A trial court has wide discretion in granting or denying amendments to the pleadings and rarely will [a reviewing] court overturn the decision of the trial court." (Internal quotation marks omitted.) *Wellington Systems, Inc.* v. *Redding Group, Inc.*, 49 Conn. App. 152, 182, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998).

"Under the statutes and rules of practice, the court may in its discretion, in a proper case, allow the filing of amendments to pleadings before, during and after trial. . . . Amendments should be made seasonably. Factors to be considered in passing on a motion to

amend are the length of delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The essential tests are whether the ruling of the court will work an injustice to either [party] and whether the granting of the motion will unduly delay a trial." (Citations omitted; internal quotation marks omitted.) *Kelley* v. *Tomas*, 66 Conn. App. 146, 174, 783 A.2d 1226 (2001).

The defendant's amended counterclaim merely sought to remove the numbers "10" and "11" from the last two paragraphs of its original counterclaim and place the paragraphs under the heading "Ad Damnum." The substance of the defendant's original counterclaim in no way was altered. Consequently, the granting of the defendant's motion would not have worked an injustice to the plaintiff or have unduly delayed the proceedings. Accordingly, the court did not abuse its discretion in granting the defendant's motion to amend its original counterclaim.

Similarly, the court did not abuse its discretion when it treated the plaintiff's answer as a motion to file an answer. "When any pleading is amended the adverse party may plead thereto within the time provided by section 10-8 or, *if the adverse party has already pleaded, alter the pleading, if desired, within ten days* after such amendment or such other time as the rules of practice, or the judicial authority, may prescribe . . . ." (Emphasis added.) Practice Book § 10-61. In this case, the defendant originally filed its counterclaim on January 14, 1999, and the plaintiff originally raised his special defenses in his answer on January 19, 1999. The defendant on January 2, 2001, then sought to amend its counterclaim because of a typographical error. The plaintiff did not file his second answer until January 18, 2001, which was in excess of the time permitted to do so by Practice Book § 10-61. Accordingly, the plaintiff waived

the special defenses he sought to raise for the first time on January 18, 2001.

## VII

Finally, we address the plaintiff's claim that the court improperly rendered a summary judgment in favor of the defendant on the complaint. Specifically, the plaintiff argues that when the defendant unilaterally scheduled a new closing date of October 27, 1994, it waived the alleged mistaken closing date of August 15, 1994, and therefore presented evidence of a disputed factual issue. We disagree.

"The standard of review for summary judgment is well established. 'Practice Book § [17-49] mandates that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party.' " *Fiaschetti* v. *Nash Engineering Co.*, 47 Conn. App. 443, 447, 706 A.2d 476, cert. denied, 244 Conn. 906, 714 A.2d 1 (1998).

The defendant claims that the plaintiff did not amend his complaint or file any factual allegations in opposition to the motion for summary judgment and never claimed that on August 15, 1994, he was ready, willing and able to close within the time specified in the contract. The defendant further claims that the reformed contract states that the closing was scheduled for August 15, 1994. The plaintiff, therefore, must allege and prove that the defendant had somehow breached the contract by selling to a third party on March 31, 1995. The defendant argues that for that reason, there is no genuine issue as to any material fact and that its

motion for a summary judgment properly was granted. We agree.

The judgments are affirmed.

In this opinion the other judges concurred.